[No. 13379. In Bank. — February 11, 1891.]

NEILS LIND ET AL., RESPONDENTS, *v.* F. CLOSS, APPELLANT.

INSTRUCTIONS — DUTY OF JURY. — The instructions of the court are the law of the case, so far as the jurors are concerned, and they are bound to follow them, whether they deem them correct or not.

ACTION BY HUSBAND FOR RAPE OF WIFE — VERDICT AGAINST EVIDENCE — DISCREDIT OF WIFE'S TESTIMONY — REVIEW UPON APPEAL. — A verdict against the defendant in an action to recover damages for a criminal assault upon a married woman will be set aside upon appeal as against evidence, where it appears that it was based on the testimony of the wife alone, under circumstances tending to throw discredit upon her testimony, and all other testimony in the case, including uncontradicted evidence as to the actions and admissions of the wife, show it to be inherently improbable that violence was used.

ID. — APPEAL — CONFLICTING EVIDENCE — RULE INAPPLICABLE. — In such a case, the rule that the judgment will be affirmed upon appeal, where the evidence is conflicting, is inapplicable.

APPEAL from a judgment of the Superior Court of Placer County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*F. P. Tuttle*, and *Grove L. Johnson*, for Appellant.

*J. D. Sullivan*, and *J. M. Fulweiler*, for Respondents.

The COURT. — When this cause was in Department One the following opinion was prepared by Commissioner Belcher. It is hereby adopted by the court in Bank, and for the reasons therein stated, the judgment and order of the superior court are reversed, and the cause remanded.

"The facts stated in the complaint are these: The plaintiffs were husband and wife, and on or about the twenty-sixth day of October, 1887, at their residence in the town of Auburn, Placer County, 'the defendant wickedly, maliciously, and violently assaulted said Johanna Lind, one of the plaintiffs herein, by jumping upon her while she was in bed, and holding her down,

and willfully contriving and intending to injure plain-tiffs, defendant did then and there ravish and carnally know said Johanna Lind, without her consent and against her will, whereby she was made sick and sore in body,' etc., to the plaintiffs' damage in the sum of fifty thousand dollars.

"The answer denies that defendant, at the time named in the complaint, or at any time, violently or wickedly or maliciously, or at all, assaulted the plaintiff Johanna, or that he jumped upon her, or held her down; or that he ravished her or carnally knew her against her con-sent or against her will, and denies that she was made sick or sore in body, or that by reason of the premises plaintiffs had suffered damages in the sum of fifty thou-sand dollars, or in any other sum.

"The case was tried before a jury, and a verdict re-turned for two thousand five hundred dollars damages, for which judgment was entered.   The defendant moved for a new trial, upon the ground, among others, that the verdict was not justified by the evidence, and his motion was denied.   The appeal is from the judgment and order.

"The plaintiff Johanna was called as a witness, and testified that she was born in Germany, and had been married about six years; that she was married in Con-necticut, and about a year thereafter came to California; that in April, 1887, she and her husband went to de-fendant's place and worked for him for one month; that they then left, but after about three months the husband again worked for defendant for one month; that in Sep-tember, 1887, they went to live in a house known as the Collins house, and about fifteen minutes' walk from de-fendant's house; and that on the morning of October 18th, the husband went to San Francisco, leaving the witness alone with her two children.   What afterwards occurred, the witness relates as follows: —

"'When evening came I put the children to sleep, and

I locked my door, and then I sat down to write a letter. Before I went to bed I went again to see if the doors and windows were fastened tight. I then went to bed. I could not sleep. I was afraid, and very near midnight I heard somebody knock. Somebody came then to the house and knocked several times, and asked if Mr. Lind was at home. I didn't answer the first, but then he knocked again, and said: "Mrs. Lind, open the door. I want to come in to you"; and I could hear then right away it was Mr. Closs, and I said: "No, sir, Mr. Closs,"— I was not going to open the door, — "if you want to see me, come to-morrow"; I would be at home; and he went, and it was only a minute and I heard something at the back door, and in a minute he stood in my sleeping-room, where I was lying with my children, and he said that I should make room for him in the bed, so he might come into bed to me, and I told him I would not let him come in the bed, and he said I should not be particular, and that I was such a funny woman. I was not like other women he had ever known in his life. And so in that time he had his clothes off, and he jumped right into bed, and I put my little baby on the side, because I wanted and needed both my hands; and he took off the quilt, and he tried to do several things. He took hold of me, and was trying to do what he wanted.

"'I struggled with him fifteen or twenty minutes. I told him he should leave me, and that I should make it hot for him; and so at last he got out of the bed, and dressed himself and went away. I didn't rest any that night, and in the morning was sick, and remained sick two or three days.

"'My husband came home the next day, and I was sitting there sick when he came home, and the next day after that we packed up, and the third day we went to San Francisco, and I got sicker and sicker; was sick a month after that. I had pains all over, and brain fever; pains in my head.'

" And on cross-examination the witness said: 'I went to bed on this night about nine or ten o'clock. My bed-room is a front room. To get into my bedroom a person coming in the back door would have to pass through two rooms.

" ' Before Closs came in, he knocked at the bedroom window several times.

" ' I heard a noise at the back door, and in a moment Closs was in the room. The door opened with very little noise. I heard no crashing sound. I examined the lock afterwards, and there was nothing broken.

" ' There was a light in the bedroom. I had my two children in bed with me, one on each side of me. When Closs came in I said to him, " You have no business here," and that he should walk right out. He com-menced talking to me, and while he was talking he was taking his clothes off.

" ' He disrobed entirely down to his undershirt. I re-mained in bed all the time. As quick as he had his clothes off he jumped into the bed, threw the bed-clothes over, and lifted up my clothes.

" 'We did not wake the children up. I was pushing him away from me. He did not beat or strike me. He did not accomplish his purpose. He then got up, dressed, and went away.

" ' He did n't hurt me, but tried to keep me down.

" ' In the latter part of October, about ten days after it occurred, I told my husband. I told my husband just as I have stated here. After talking with my husband, he said he would fix Closs, and he would demand one thousand dollars from Closs; and I sat down and wrote a letter to Closs demanding one thousand dollars. I first went to a lawyer about it in January, 1888.

" ' Closs called on me while I was in San Francisco, about three weeks after this trouble. He called again, between Christmas and New Year's, and saw my hus-

band and myself.  He called on me and my husband at those times in San Francisco to try to settle.'

" The defendant was a witness in his own behalf, and testified that he had a ranch of eighty acres, about one mile from the town of Auburn, on which he had resided for about four years; that in February, 1887, he desired help on his ranch, and advertised for it; that in answer to the advertisement the plaintiffs came to his ranch, and the wife went to doing household work and the husband outside work for him; that they then left and moved into the Collins house, which was about ten minutes' walk from his house.  He then says: 'In October she told me her husband was going to San Francisco.  I went to her house about half-past ten or eleven o'clock.  I did not know whether Lind had returned or not; I knocked at the window and asked if Lind was there, and I asked her to let me come in, and she told me first to go away and come to-morrow.  Mrs. Lind told me that he was not there, and then I went around and went in by the open back door. . . . .

"'The door was not locked; I was not obliged to put my shoulder to the door, and made no unusual effort to get in.  When I lifted the thumb-latch, the door opened readily.

"'I went in the bedroom, and Mrs. Lind picked up a child which was in the bed, and put it in an adjoining bed.

"'I undressed myself and stayed there a couple of hours.  Mrs. Lind asked me to come back the following day.  I saw her next day and the day after, and she was not sick at all.

"'Mrs. Lind asked me for the use of my buggy to go to the station, and I myself took Mrs. Lind to the depot in the buggy the second day after this night.  She gave me her address in San Francisco, and invited me to call when I went down.

"'I went to see her in San Francisco, and she there

told me that her husband had suspicioned something, and she had told him only of this one night when he was away, and that her husband was mad, and I should give him a few dollars. . . . .

"'I saw Mrs. Lind in the presence of Mr. Sullivan, and there told her that she knew I never had used any violence, and that it was all done with her will. She admitted that. She then said she would n't like to go to Auburn, and if I would pay five hundred dollars she would not.

"'I never used any violence on her, and never made any assault upon her. Everything was done with her will and consent.'

" The husband was called as a witness in rebuttal, and testified: 'Had a conversation with Closs about Christmas, 1887, and he told me about having connection with her on the night of October 18, 1887, and that he had never done so before.'

" This was substantially all the testimony in the case, and the question is, Did it justify the verdict?

" The court instructed the jury that the complaint charged a violent assault made by defendant upon the person of Mrs. Lind, and that she was debauched against her consent and will; that the case turned upon the question of violence, and that if violence was used, as charged, then they should find for the plaintiffs; but that if no violence was used, the connection being with her consent, then the verdict should be for defendant.

" The instructions were the law of the case, so far as the jurors were concerned, and they were bound to follow them, whether they deemed them correct or not.

" As to whether violence was used or not, the testimony was conflicting. Mrs. Lind stated positively that violence was used, and the defendant stated equally positively that it was not. If the case had been rested on this conflict alone, the judgment, under a well-settled rule, would have to be affirmed. But other facts and cir-

cumstances appeared, which seem to us to militate strongly against the truthfulness of Mrs. Lind's statements.

"The following examples may be noted: She testified that defendant did *not accomplish his purpose,* and that she told her husband about the matter as she had told it in court; and yet the complaint, which was verified by the husband, and filed in February following, charges that he did accomplish his purpose, and this defendant, in effect, admitted both in his answer and testimony. How is this discrepancy to be accounted for?

"She further testified that she did not tell her husband of the outrage which she had suffered for ten days, though she was made sick by it, and so continued for a considerable time. Is it probable that a woman would, under such circumstances, remain silent so long in the presence of her husband?

"The defendant testified that two or three days after the alleged offense, when Mrs. Lind was about to leave for San Francisco, she asked him for the use of his buggy to go to the station, and that he took her to the depot in his buggy; and this is not denied. Now, is it conceivable that a woman who had been treated as it is claimed she had been, would so soon ask or accept such favors from the man who had committed the wrongs against her?

"Defendant further testified that Mrs. Lind gave him her address in San Francisco, and invited him to call on her there; and this is not denied. Now, is it possible that she would have done so if she had been assaulted, as stated, two days before?

"Again, defendant testified that on one occasion, when he saw Mrs. Lind in San Francisco, he told her in the presence of Mr. Sullivan that she knew he had never used any violence, and she so admitted. Now, this statement was either true or false. If true, it shows that the plaintiffs, under the instructions of the court, were not

entitled to recover.   But it was not denied, though she and Sullivan must have been in court, and if untrue, presumably would have denied it.

" It has been several times held in this state, where the accused parties have been convicted of rape on the testimony of the complainant alone, and under circumstances tending to throw discredit upon her testimony, that the judgments should be reversed, the court saying that ' a conviction upon such evidence would be a blot upon the jurisprudence of the country, and a libel upon jury trials,' and that ' the ends of justice demand that the cause shall be tried anew.'   (*People* v. *Benson,* 6 Cal. 221; 65 Am. Dec. 506; *People* v. *Hamilton,* 46 Cal. 540; *People* v. *Brown,* 47 Cal. 447; *People* v. *Ardaga,* 51 Cal. 371.)

" We think these cases in point here, and that the ends of justice require that this case be tried anew.

" We therefore advise that the judgment and order be reversed, and the cause remanded for a new trial.

" FOOTE, C., concurred."

Rehearing denied.